UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,        .
                                 .
         Plaintiff,              .   CR No. 08-0224 (JDB)
                                 .
    v.                           .
                                 .
ERIK M. LAMB,                    .   Washington, D.C.
                                 .   Friday, July 17, 2009
         Defendant.             .   9:15 a.m.
                                 .
.  .  .  .  .  .  .  .  .  .  .  .  .

TRANSCRIPT OF SENTENCING
BEFORE THE HONORABLE JOHN D. BATES
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government:          PATRICIA Z. STEWART, AUSA
                             U.S. Attorney's Office
                             555 Fourth Street, NW
                             Room 4272
                             Washington, D.C. 20530
                             202-514-7064

For the Defendant:           TONY W. MILES, AFPD
                             Federal Public Defender Office
                             625 Indiana Avenue, NW
                             Suite 550
                             Washington, D.C. 20004
                             202-208-7500

Court Reporter:              BRYAN A. WAYNE, RPR, CRR
                             Official Court Reporter
                             U.S. Courthouse, Room 6714
                             333 Constitution Avenue, NW
                             Washington, D.C. 20001
                             202-354-3186

Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

```
1                    P R O C E E D I N G S
2              THE DEPUTY CLERK:  Your Honor, we have criminal action
3      08-224, United States of America versus Erik Lamb.  We have
4      Ms. Patricia Stewart representing the government, Mr. Tony Miles
5      representing Mr. Lamb, and we also have Mr. Michael Penders
6      representing the probation office.
7              THE COURT:  Good morning, everyone.
8          We're here today for sentencing in this matter, and I have
9      received various materials and have reviewed them all and will
10     take them all into consideration.  Those include the presentence
11     investigation report, most recently revised yesterday, with
12     additional information, and memoranda from both the government
13     and the defense, and some additional letters that have been
14     provided to me today by the defense.  I assume that copies of
15     those have been given to the government as well?
16             MR. MILES:  Yes, they have.
17             THE COURT:  And a filing under seal pursuant to
18     Title 18, Section 3509(d)(2), which I have reviewed and will
19     take into consideration as well.  Let me start, as I need to do,
20     with whether each side has received and reviewed the presentence
21     report, including the most recent revisions to the presentence
22     report.  Mr. Miles, have you and Mr. Lamb received that report
23     and had a chance to review that report?
24             MR. MILES:  Your Honor, we received the most recent
25     one yesterday evening.
```

```
1              THE COURT:  I am aware of that.

2              MR. MILES:  I have reviewed it.  I've told Mr. Lamb

3    about it and I've briefed him on it, and he has a copy with him,

4    but he has not read the portions which have been --

5              THE COURT:  The additional paragraphs.

6              MR. MILES:  The additional paragraphs, correct.

7              THE COURT:  If there comes a point during these

8    proceedings where I need to take time to permit him to do so,

9    you be sure to inform me of that.

10             MR. MILES:  Thank you, Your Honor.

11             THE COURT:  Now, before you sit down, with respect to

12   the presentence report, setting aside -- well, from your

13   perspective, at least, with respect to the entirety of the

14   presentence report, what do you view with respect to the report

15   as any issues that remain in dispute?

16             MR. MILES:  If the Court will indulge me, if I could

17   look at my notes.

18             THE COURT:  Certainly.  You did file some objections.

19   Most of those objections -- well, there's a response from the

20   probation office with respect to all of those objections.  And I

21   think with respect to -- I know that you have some issues that

22   we may need to address with respect to the presentence report

23   and its review of the plea in Kitsap County, Washington, that's

24   set out in paragraphs 89 through 93 of the report, and then in

25   the additional paragraphs added to the report in paragraphs 94A
```

1    and 94B.

2         MR. MILES:  The only issues we have are around the

3    Kitsap County case.  No other issues except there is one matter

4    which is incorrect, and I repeated the incorrect version in my

5    filing.  I was wrong on it as well.  There is discussion about

6    prior abuse Mr. Lamb suffered.  We represented that was by his

7    mother's boyfriend.  It was the mother's boyfriend's son.

8         THE COURT:  All right.  From the government's

9    perspective, have you had a chance to review the presentence

10   report and are there any remaining issues in dispute,

11   Ms. Stewart?  And good morning.

12        MS. STEWART:  Good morning, Your Honor.  I have had

13   the opportunity to review it, and the government has no

14   objections.  There are no issues for the government.

15        THE COURT:  All right.  All right.  I will, under

16   federal rule of criminal procedure 32(b)(6)(D), accept the

17   presentence report as findings of fact on issues that are not in

18   dispute.

19        Now, this case does fall under the Sentencing Reform Act of

20   1984, by which the United States Congress created the U.S.

21   Sentencing Commission, and that commission has issued detailed

22   guidelines for judges such as myself to consider in determining

23   the sentence in a criminal case like this.  The commission has

24   set out sentencing ranges for specific offenses.  They're all

25   contained in a guidelines manual.

1          Now, nonetheless, in light of Supreme Court decisions over

2     the past few years, those sentencing guidelines are not

3     mandatory, they're advisory only, although they must be

4     considered by the Court in determining the appropriate sentence

5     in any case.  So that is what I will do.  I will assess and

6     determine the proper sentence in this case by referring to and

7     considering the sentencing guidelines in the first instance, but

8     they will be treated as advisory, not mandatory, and there's no

9     presumption that a guidelines sentence is the correct sentence.

10    The guidelines will simply be considered along with all other

11    relevant factors pursuant to Title 18 Section 3553(a).

12         I need to turn initially, however, to the guidelines

13    calculation.  And let me do that.  The relevant guideline is for

14    the most part that which is set forth at Section 2G2.2 of the

15    guidelines.

16         There are two counts here.  Count 1 -- both of which the

17    defendant pled guilty to.  Count 1 is transportation of child

18    pornography in violation of Title 18 of the U.S. Code Section

19    2252A(1) -- I'm sorry.  2252A subsection (a)(1) and 2256(8).

20    Count 2 is possession of child pornography, in violation of

21    Title 18 of the U.S. Code, Section 2252A subsection (a)(5) and

22    Section 2256(8).

23         Now, the guideline calculation is done under the 2008

24    guidelines manual.  Those two counts are what we call grouped

25    together for assessment, because the offense level is largely

1    determined here by a measure of the aggregate harm here, based

2    in significant part on the number of images involved.

3        Under Section 2G2.2(a)(2), the base offense level is 22.

4    There are then, under the guidelines, several special offense

5    characteristics which apply here.  First, under Section

6    2G2.2(b)(2), we have material involved -- the material involved

7    a prepubescent minor or a minor who had not attained the age of

8    12, and that raises the offense level by two levels.  Under

9    Section 2G2.2(b)(3)(F), we have an offense that involved

10   distribution, and that too raises the offense level by two

11   levels.

12       Under Section 2G2.2(b)(4), we have an offense involving

13   material that portrays sadistic or masochistic conduct or other

14   depictions of violence, and that increases the offense level by

15   four.  Under 2G2.2(b)(6), we increase by two levels because the

16   offense involved the use of a computer.  And lastly, under the

17   guidelines Section 2G2.2(b)(7)(D), we increase the offense level

18   by five levels because the offense involved 600 or more images.

19       When you add those all up, you come out with an adjusted

20   offense level of 37.  That is decreased because of adjustments

21   for acceptance of responsibility.  Under Section 3E1.1(a)

22   there's a two-level decrease for a clear demonstration of

23   acceptance of responsibility.  And under Section 3E1.1(b)

24   there's a one-level decrease based on the government's motion

25   which has been filed, and I will grant, a decrease of one level

for assistance in the investigation by the timely provision of

information concerning the defendant's involvement and by timely

notification of an intent to enter a guilty plea.  Those

three-level decreases result in a total offense level of 34.

The criminal history here involves one prior offense.  It's

set out in paragraph 34 of the presentence investigation report,

and it's set out in some detail there.  Indeed, considerable

detail.  It is also an event that is the subject of further

discussion in the presentence investigation report, which I will

get to in a moment.

But for purposes of the criminal history calculation, this

prior conviction for communication with a minor for immoral

purposes results in one criminal history point and therefore the

criminal history category is category 1, the lowest criminal

history category.

The guideline range based on that total offense level of 34

and a criminal history category of 1 is 151 to 188 months.  That

is the guideline-recommended range for incarceration in this

case.

Now, I know that there is an argument, which we will

address, that some or all of the increases to the offense level

under the provisions of Section 2G2.2 of the guidelines are not

well founded and should not be applied, either in this case or

in other cases, quite frankly.  But for the moment, I will ask

simply whether, based on the provisions of the sentencing

1    guidelines, there is any objection to these conclusions as to

2    the appropriate offense level, criminal history category, and

3    advisory guideline range under the sentencing guidelines.

4    Ms. Stewart?

5              MS. STEWART:  Not from the government, Your Honor.

6              THE COURT:  Mr. Miles?

7              MR. MILES:  We have no objection, Your Honor.

8              THE COURT:  All right.  Now, Mr. Miles, that means, do

9    you agree, that the defendant does not contest that this offense

10   involved the various things that I just noted a moment ago in

11   reviewing the application of Section 2G2.2 and its various

12   subparts?  For instance, it involved material that involved a

13   prepubescent minor or a minor who had not attained the age of

14   12.  The material involved in this offense involved

15   distribution, it portrayed sadistic or masochistic conduct or

16   other depictions of violence, a computer was involved, and the

17   offense involved more than 600 images.  I take it there is no

18   dispute that all of that is true.

19             MR. MILES:  That is correct, Your Honor.

20             THE COURT:  Now, as I've said, under the law following

21   United States v. Booker, the sentencing guidelines are advisory,

22   but they will be fully considered by the Court, along with all

23   other relevant factors under Section 3553(a) in determining the

24   proper sentence.

25        Now, let me just address one thing before I hear from

1    counsel.  I have received material filed under seal -- give me

2    one second.  Sometimes I can't put my fingers on things

3    immediately.  And that has been filed pursuant to Section 3509

4    of Title 18.  It is material from victims in the sense of

5    victims of child pornography generally, not -- well, it's

6    material from both the victim of child pornography and her

7    parents.  And the victim is now 19 years old by my calculation

8    of reading the materials, and it is -- this material is a

9    moving, firsthand narrative of the devastating impact of child

10   pornography on the children victims of child pornography, those

11   whose images are then distributed widely, nowadays mainly by the

12   Internet, and reviewed by far too many, unfortunately, people,

13   including the defendant in this case.

14       As I said, it's a moving firsthand narrative of the

15   devastating effect of child pornography, not only on the

16   children victims but also on their families, and therefore it is

17   a confirmatory statement of the fact that this is not a

18   victimless crime.  There are real people suffering real impacts

19   from child pornography and from the fact that individuals such

20   as the defendant distribute and review such materials.

21       As I said, it's not a victimless crime; it has lasting

22   impacts on the child victims and their families.  I have

23   reviewed the material submitted and it is confirmatory of that

24   fact.

25       I also will point out, because I think it needs to be

1    addressed during the course of this discussion we're about to

2    have, that the presentence investigation report, particularly as

3    revised, does include information -- it's now at paragraphs --

4    some information is at paragraphs 46A, 46B, and it's labeled in

5    the report as 47C but I think it actually should be 46C.  And

6    then other information is included in paragraphs 89 through 93,

7    which were the paragraphs of the prior version of the report,

8    and then the additional paragraphs at 94, 94A, and 94B.  All of

9    this relates to the prior offense that's set out in the

10   presentence investigation report at paragraph 36 in Kitsap

11   County in Washington.

12        I don't know, with respect to the government or the

13   defendant, what, if any, request is being made with respect to

14   this information and with respect to my consideration of it in

15   sentencing.  But perhaps I will hear more on that as I now hear

16   from the parties.

17        I think I will do it in this order.  I think I will hear

18   first from the government, I will then hear from the defense,

19   Mr. Miles.  Based on that, I'll allow the government to tell me

20   if they have anything further they wish to say.  I'll hear from

21   probation if it wishes to speak, and I'll also hear from

22   Mr. Lamb if he wishes to speak.  But let's start first with the

23   government.  Ms. Stewart.

24             MS. STEWART:  Thank you, Your Honor.  Your Honor, the

25   government does not intend to repeat what we have put forth in

1    our written submission to the Court.  We would like to note a

2    few points, however.  With respect to the guidelines, in the

3    defendant's memorandum, he makes what are common complaints that

4    the guidelines are not based on empirical data, et cetera.  But

5    he has two specific points that he makes that we would address.

6        One, he objects to the two-point enhancement for use of a

7    computer.  There's a reason for that enhancement, and I think

8    the Court has touched upon it.  When child pornography is

9    distributed by mail, it's at least possible to retrieve it and

10   destroy it.  But when it's distributed as it is in this case, in

11   cyberspace, it can never be retrieved.  Within minutes, literal

12   minutes, it can be to hundreds of people around the world.  It's

13   irreparable and it's everlasting when it's distributed by

14   computer.  And for that reason, there's a logical reason for the

15   enhancement.

16        THE COURT:  It is an enhancement, nonetheless, that

17   swallows the rule, because there is no case these days that

18   doesn't involve a computer.

19        MS. STEWART:  Well, we prosecuted one recently by

20   mail, Your Honor.  But the Court's point is well taken; the vast

21   majority are.  If the Court were to reject that enhancement, the

22   guideline range as we calculate it would be 121 to 151 months, a

23   difference at the high and low ends, but the guidelines meet in

24   the middle on those ranges of 151 months.

25        With respect to his objection about the numbers, it is

completely unfounded.  The defense claims that the guideline

adjustments for numbers of images should not apply to someone

like him who sent, in his words, a few images to the undercover

officer and who possessed, quote, several in his computer.  In

fact, he swore under oath at the plea hearing that he sent

hundreds to Detective Palchak.  And Detective Palchak -- with

the Court's permission belatedly I'm asking is at counsel

table -- and he can assure the Court of the number of images

because he has gone back and looked at them.  They are in the

hundreds.

THE COURT:  There's no dispute there's over 600

images.  I went through that with Mr. Miles just a moment ago.

MS. STEWART:  And there were thousands on his

computer.  So for him to say that the adjustment for 600 or more

is not appropriate is simply incorrect.  If anything, it

understates the number of --

THE COURT:  I don't think his argument is -- not to

put words in their mouth.  I don't think his argument is that

there were not that number of images factually involved in this

case.  His argument is that the structure of the sentencing

guidelines, following some other judges who've written opinions

and made observations, that the structure of the sentencing

guidelines including the provision at (b)(7), based on the

number of images, is not really one that has any empirical

foundation or is the result of some national, nationwide

1   analysis, that this just isn't anything more than congressional

2   directive and numbers pulled out of the air, that there's no

3   real magic to 10 versus 150 versus 300 versus 600, which are the

4   numbers set out.

5       I don't think his challenge is based on the facts of this

6   case; I think his challenge is a more abstract one to the

7   legitimacy, if you will, of that guideline and its application.

8           MS. STEWART:  Your Honor, that may well be.  I would

9   only note that in many other cases, whether it's drugs or white

10  collar crime, there is always some type of basically guideline

11  level that is based on amount.  And I think in this case there

12  is also a provision for an upward departure for over 600, which

13  the government did not seek.  But the number of images, whether

14  they be 600 or 500 or a thousand, the damage that is done

15  increases with the number that is distributed and possessed.

16  And in this case we submit it's a very appropriate adjustment

17  for someone who had the amount of images that this defendant

18  did.

19      With respect to the 3553 factors, Your Honor, the

20  government submits, to truly appreciate the nature and

21  seriousness of the offense, it would be very useful for the

22  Court to view some of the images the defendant possessed and

23  distributed.  And we're prepared to show them to the Court if

24  the Court is willing to view them.

25      We have described as best we can the images that this

1   defendant sent via the Internet to Detective Palchak, and those

2   are the ones he has here today.  What is important is that they

3   are particularly sadistic.  We've seen an increase over the

4   years in -- a decrease actually in the age of the children and

5   an increase in the level of violence.  And this defendant

6   possessed particularly sadistic images.

7       We can describe them.  Children blindfolded, gagged, in

8   restraints when they're sodomized, children apparently 1-1/2 to

9   2 years old.  They're unknown.  There's a video where a child's

10  screaming.  Mercifully, you can't hear it because someone puts

11  their hand over her mouth.  She's approximately 18 months old

12  and she's violently raped.  A prepubescent girl sucking an

13  adult's penis, and you can hear a little child screaming while

14  she's being raped and sodomized.

15      These are the videos that the defendant chose to collect

16  and share.  He did not do anything to these children.  We're

17  well aware of that.  I mean, for him, watching their abuse was a

18  spectator sport.  But the damage that is done by his offense is

19  nevertheless directed to these children.  I think the Court

20  appreciates it from the Court's remarks.

21      We are essentially a market economy.  These images are not

22  produced but for the fact that someone wants to have them.  They

23  are made for the consumer.  Congress recognizes it, the case law

24  recognizes it.  And defendants who simply collect them and look

25  at them are directly responsible for the nature of the abuse,

1    because you've got to get something new, and you've got to get

2    something more exciting for people to want to view it.

3         There's been a lot of discussion in the presentence report

4    with respect to whether or not the defendant sexually molested a

5    young child in the state of Washington years ago.

6              THE COURT:  It involves more than one child.

7              MS. STEWART:  Yes, it does.  The charge was one child,

8    and now there are allegations of more.  In connection with the

9    offense to which he pled guilty, we understand his position is

10   that it was an Alford plea and he was truly factually innocent

11   in that case.  And we can't determine whether or not he was or

12   he was not at this point.

13        But the government's position is that when the Court looks

14   at the nature and characteristics of this defendant, one thing

15   is absolutely clear.  Whether he actually molested children or

16   didn't, he has had a very long-standing and a very -- sexual

17   interest in children.  I think that's undisputed.  He collected

18   child pornography during this period of his life, he had cutouts

19   of children in underwear.  Perhaps most disturbingly, he went

20   out and bought a little girl's underpants, as he said, because

21   he fantasized about sexual activity with children.

22        Whether or not he actually acted on his fantasies is

23   important, and we may not be able to determine whether he did or

24   not, but the Court can be assured that over a period of years he

25   has continued to have a sexual interest in children, and that he

has gotten skilled at hiding his illegal behavior.

This defendant, Your Honor, as we set forth in the facts, was one of the more difficult people to identify.  He used a false screen name, he used a false subscriber name.  He used public facilities to send these images to Detective Palchak and to talk in great detail about his sexual desires with respect to children.  As the Court is aware, he was actually caught at a county library, using the county computer, while he was talking to Detective Palchak, FBI agents found him.

So he is skilled at evasive behavior, and that combination of a long-standing sexual interest in children and his ability, his intelligence to avoid detection, we would submit calls for a substantial period of incarceration and a structured scheme by which he can be provided with sex offender treatment.

In his memorandum, the defendant says that one of the reasons he was so vulnerable at the time he communicated with Detective Palchak was because he was receiving treatment.  The same time he asks that he be released after a minimum mandatory sentence to receive treatment from the same providers.

He has minimized.  Perhaps that's understandable.  When he was arrested he told Detective Palchak he never looked at the images he sent; he just passed them on.  That's an audio recorded statement if the Court wishes to hear it.  Only when Detective Palchak said to him, "look, we've talked about this. Come on, I am Jim P.  We've talked." "All right.  I looked at

1   those.  I don't collect them."  I listened to that again this

2   morning.  "I don't have -- I don't collect these things."  He

3   had over a thousand on his computer.

4        This defendant has had the benefit of sex offender

5   treatment, and it's obviously failed.  What we submit that he

6   needs, Your Honor, what the community needs, is that he be

7   incarcerated for a substantial period of time and receive sex

8   offender treatment in a structured setting, and be placed on a

9   period of supervised release that will ensure the community, as

10  best we can, that he is not going to engage in this behavior

11  again.

12       Such a sentence hopefully would be a deterrent also to

13  those in the community who continue to view this as a victimless

14  crime, a harmless exercise, where someone in the privacy of his

15  own home is just viewing things for sexual fantasies.  We're not

16  the morality police.  Mr. Lamb's sexual wishes, his sexual

17  desires are of no moment to the government, but his conduct is.

18  And his conduct in this case has been extremely serious and

19  damaging, and we ask that the Court impose appropriate sentence.

20  Thank you.

21            THE COURT:  All right.  Thank you, Ms. Stewart.

22       Mr. Miles.

23            MR. MILES:  Thank you, Your Honor.  Your Honor, I'm

24  going to begin by making reference to the Kitsap County case.

25  And it is our view that the Court should not consider conduct in

that case.  Our view is not simply that Mr. Lamb did not

acknowledge that he pled to an <u>Alford</u> plea.  That case had

strong evidence indicating that Mr. Lamb did not engage in the

conduct which he was accused to have participated in.

There were polygraph tests that I understand he passed, two

sets.  A psychologist or psychiatrist in the state of Washington

administered two tests, and he was administered a test in

California.  I understand he passed all of them.  The alleged

victim's initial statement when interviewed by a professional,

very detailed interview, an interview that stressed the

importance of telling the truth, making sure he understood the

difference between telling the truth and lying.  And in that

statement he was asked repeated questions about whether Mr. Lamb

did anything inappropriate.  They were specific questions

describing specific conduct, whether he engaged in specific

conduct.  And the answer was no.

And I understand there are other factors as well, but

again, my goal here was not to focus on that.  I think the Court

should not consider it.

THE COURT:  The goal is to have me not focus on it, I

think.

MR. MILES:  Correct.  Well, for me not to focus on it

and in turn for the Court not to focus on it.  For a good

reason.  Not just because they're awful allegations, but there's

strong evidence that they did not happen.  The government

1   acknowledges it does not know, and it's our view that it did not

2   happen and we ask the Court not to consider it --

3            THE COURT:  So you think there's too little for me to

4   consider in any way.  First of all, there would be too little

5   for me to take specifically into account under the guidelines

6   and by applying 2G2.2(b)(5) and the five-level increase based on

7   any pattern of activity involving sexual abuse.  And then

8   secondly, that I shouldn't also take it into account under the

9   comment note, which is comment note 6, with respect to -- even

10  if that provision doesn't apply, the (b)(5) provision doesn't

11  apply, that I shouldn't take it into account under that note

12  that allows consideration for an upward departure based on

13  sexual abuse conduct.

14           MR. MILES:  That is correct.  And further, we would

15  ask the Court not to take it into account under Section 3553(a).

16           THE COURT:  And the reason is because there's too much

17  uncertainty surrounding those facts?

18           MR. MILES:  From our view, that would be a generous

19  way of putting it.  We believe the evidence indicates it did not

20  happen, and that he did not do it, but if I were to state it in

21  the light most favorable to the government, there is serious

22  uncertainty, and because of that the Court should not consider

23  it and hold that against Mr. Lamb.

24           THE COURT:  In order to consider it, I would have to

25  find what by what standard?

1          MR. MILES:  I believe it's preponderance of the

2     evidence, but I'm not certain.

3          THE COURT:  And I just have to find that the conduct

4     occurred by a preponderance of the evidence.

5          MR. MILES:  I believe so.

6          THE COURT:  All right.

7          MR. MILES:  Should I proceed?

8          THE COURT:  To other things?  Yes, you may proceed to

9     other things.

10          MR. MILES:  Thank you, Your Honor.  And the Court I

11     think was very correct and accurate in assessing our argument in

12     its conversations with the government.  We agree to the

13     guideline calculations, we agree that the facts which underline

14     the specific offense characteristics occurred.  There were a lot

15     of images involved.  We make a distinction between what he

16     possessed and what he distributed.  He possessed quite a bit

17     more than what was distributed to Agent Palchak.  And I think as

18     the guidelines are concerned, it would amount to more than 100

19     images because videos count as 75.

20          My recollection is Mr. Lamb did not send more than a

21     hundred different files, if you will, to Agent Palchak, but a

22     video constitutes 75 images under the guidelines, and that

23     obviously helps the numbers increase significantly.

24          Our position, Your Honor, is that the guidelines Section

25     2G2.2 is not based on sound reasoning, it's not based on any

1    study, historical examination or any empirical evidence.

2              THE COURT:  Don't you agree that numbers matter, that

3    numbers should be a consideration?  Whether someone sort of

4    incidentally opened one file and viewed some child pornographic

5    images, six or eight of them, versus someone who consistently is

6    reviewing such material?  Doesn't that make a difference?

7              MR. MILES:  I agree, it does.  There's a couple

8    problems here.  One of the problems is that when Congress

9    determined how to assess increases for the number of images

10   viewed, it was not done based on study or empirical data, and we

11   view that as a problem.  Unlike other portions of the

12   guidelines.  That's what the sentencing commission is supposed

13   to do.  They're supposed to create guidelines and increases

14   based on trends and empirical evidence and study.  And that was

15   not done here.  So that's one of the huge problems.

16        Another problem is this use of a computer thing kind of

17   cuts both ways.  In many ways it opens up defendants to more of

18   these enhancements, because it's more easier to get these images

19   via computer.

20             THE COURT:  Well, they build on each other.

21   Certainly, if someone uses a computer, they have access to the

22   Internet, and that's these days access to a vast storehouse of

23   child pornography.

24             MR. MILES:  In my understanding, sometimes they may

25   receive a file, what may appear to be one file, and within it

 1    contains hundreds of images.  And so that may be an instance

 2    where someone's intent was just to receive one, but they in turn

 3    receive hundreds.  So there are all kinds of problems associated

 4    with the number of images and using a computer.

 5              THE COURT:  Structurally, with respect to that

 6    guideline, there's a point there.  Factually, with respect to

 7    this case, there's less of a point.

 8              MR. MILES:  I believe in this case there were files as

 9    I described.

10              THE COURT:  But there were lots of them.

11              MR. MILES:  There were lots of files.  I'm going to be

12    straight with the facts here.  There were lots of files,

13    Your Honor.  But many of them were videos, which increased the

14    numbers, and many -- at least some, I can't necessarily say

15    many, but some were files that appeared to be containing one

16    image or one file and within it were multiple images.

17        We specifically, in our papers we made a specific challenge

18    to the use of the computer enhancement, and then of course we

19    made the more general challenge.  We find the use of the

20    computer enhancement absurd and totally unfounded, particularly

21    in today's age.  When it was instituted it may have made more

22    sense.  But now, when pretty much everyone uses the Internet,

23    uses a computer, and almost all -- well, all cases I've handled,

24    the computer was used.  I've never had a case where a computer

25    was not involved.  And this enhancement applies to most

1    everyone, and certainly everyone in my experience.

2         The government argued that one of the reasons that this

3    enhancement is in place is because defendants can use a computer

4    to widely distribute child pornography.  But that was not the

5    case here.  Mr. Lamb only distributed this pornography to the

6    undercover officer.  He thought he was a friend that he met over

7    the Internet and he distributed to him.  This is not a case that

8    he was involved in wide distribution or any type of commercial

9    distribution or that he maintained a Web site which allowed

10   multiple people to have access to these images.  And so we think

11   that that enhancement in this case is particularly unreasonable

12   and inappropriate.

13        More generally -- we wrote quite a bit about it in our

14   pleadings.  I don't want to repeat a lot of what I said.  I'll

15   just try to hit on the main points.  I think that Section 2G2.2

16   does not adequately distinguish between those distributing

17   images for commercial purposes versus someone like Mr. Lamb who

18   in this case distributed to an undercover officer who he

19   believed was a friend.

20        The 2G2.2, the enhancements in place apply to most -- in my

21   experience at least, most child pornography defendants, because

22   of the Internet, because the images regularly and frequently

23   these days involve children under 12 or prepubescent minors,

24   sadistic and masochistic conduct, these enhancements are

25   frequently applying in cases.  The use of the computer issue I

1    already discussed.  The number of images is a matter we've

2    already discussed.  And these are enhancements that repeatedly

3    apply in cases and there's no evidence -- or we know that the

4    sentencing commission did not create those enhancements based on

5    any empirical study.  It seems it's more related to mandatory

6    minimum penalties that Congress has instituted.

7        So we think structurally this guideline has serious

8    problems.  There is the Stabenow study that discusses it.  There

9    are many courts in various districts, including this district,

10   which have come to the same conclusions.

11       I will note that I understand that actually just yesterday

12   Judge Huvelle in this district found that this guideline was

13   structurally unsound and unreasonable, and imposed I understand

14   a probationary sentence.

15           THE COURT:  I think that's right.  I think the facts

16   of that case are somewhat different from the facts in this case.

17           MR. MILES:  And the guidelines were lower.  We're not

18   asking for probation.

19           THE COURT:  There was no mandatory minimum.

20           MR. MILES:  There was no mandatory minimum.  I believe

21   the guidelines were 78 to something.  So we recognize factually

22   different.  Some similarities, including the childhood abuse

23   experience was present in that case, which is present here,

24   which, based -- it was at least referenced by Ms. McAndrews, who

25   wrote the letter, who was one of his treatment providers, stated

1      that --

2              THE COURT:  I'm not sure what you can do with Judge

3      Huvelle's case, because if you're moving into a 3553(a)(6)

4      discussion of unwarranted sentencing disparities, you're not

5      going to be able to argue that that's a sentence that should be

6      the same kind of sentence imposed here.

7              MR. MILES:  And we agree.

8              THE COURT:  You can't argue that, so I'm not sure that

9      case is going to be of any use to you on that route.  And you

10     haven't -- you've made an unwarranted sentencing disparity

11     argument, but it's all based on cases outside of this

12     jurisdiction, and it doesn't consider any cases within this

13     jurisdiction.

14             MR. MILES:  That's correct, Your Honor.

15             THE COURT:  That's because the cases within this

16     jurisdiction tend to be higher than 60 months.

17             MR. MILES:  I don't know for sure.  My experience,

18     that's correct.  I have not had a sentencing, though, in a case

19     like this since the -- there's been more critique of this

20     guideline section.  This is the first time I've been able to

21     make this argument, and I think it's catching on now, and more

22     courts are doing this, and I wish I could have those cases back

23     and go to sentencing again.

24          So it seems to me the trend in this district is moving in

25     the direction of lower sentences, closer to mandatory minimums.

1   And I understand that Judge Huvelle made reference to a case or

2   cases by Judge Roberts.  I'm not aware of the specific case and

3   I haven't been able to look at those.  But I understand Judge

4   Roberts is also finding this section of the guidelines

5   structurally unsound and imposing sentences below the

6   guidelines.  So I believe that the trend in this district is

7   moving away from the sentences that were previously imposed in

8   these types of cases.

9       Moving away from that argument, I think the Court

10  understands the argument pretty well there.  When we look at

11  specific factors under 3553(a), we also believe our requested

12  sentence of 60 months is appropriate.  Looking at the nature and

13  circumstance of the offense, there's no doubt that what Mr. Lamb

14  did was wrong.  He knows it's wrong.  He possessed a lot of

15  images, and we acknowledge that, and certainly more images than

16  the case involved with Judge Huvelle yesterday.

17      But it's significant to point out, Your Honor, that this

18  was not a case involving commercial distribution or any other

19  type of widespread distribution.  Mr. Lamb was not involved in

20  the production of child pornography and there was no

21  inappropriate contact with children.

22      At the time of the offense, Mr. Lamb, he knew he had a

23  problem.  He was being treated for the problem.  He was in the

24  middle of treatment.  The government says his treatment failed.

25  It was working, we submit, and the letter written by his

1    treatment provider said it was successful.  He was not treated

2    yet.  His treatment was not complete.  And so we're not saying

3    that he was healed at the time he got involved in this offense.

4         He was at a time -- and I'm not trying to make this sound

5    like an excuse, because he was wrong and what he did was

6    criminal, but he was vulnerable at the time he met with the

7    detective and got involved in this conduct, and he was working

8    through his problems.

9         So I think it's significant that this is a person that

10   understood he had an issue and he was working with his issues

11   and he was somebody who was attending his sessions regularly.

12   He wasn't somebody trying to avoid it and not deal with it.  And

13   I think that's very significant.  And when he was arrested, he

14   admitted to having sent the material to Detective Palchak.  And

15   we acknowledge that his statement at the time was not fully

16   forthcoming with regard to whether he viewed them or not.  He

17   was scared.  He was nervous.  He knew he was in a lot of

18   trouble.  But he admitted to the heart of the conduct, that he

19   was involved with this conduct, and that he possessed these

20   types of images and he sent them on to Detective Palchak.

21        Your Honor, we disagree strongly with the government's

22   argument that he was somehow skilled at not being detected.  I

23   spoke to Mr. Lamb and I spoke to his family, who incidentally, I

24   want to let you know, are here today.  His mother and stepfather

25   have come here all the way from California to be present at the

1    sentencing.

2         I spoke with them about this issue.  Mr. Lamb had a prepaid

3    telephone.  That's one of the means which the government thinks

4    he was using to intentionally deceive and not be detected.

5    That's what they had been -- it was their decision to give him a

6    prepaid phone, because with a prepaid phone, you can monitor how

7    much money is being spent rather than just allow him to make a

8    lot of calls and you could get a bill for hundreds of dollars.

9    And so the parents wanted him to have a prepaid phone for that

10   purpose.  And so he did not have that type of phone consciously

11   to try to avoid detection.

12        And where he was living -- now on to the issue of using the

13   computer in the library.  Where he was living, he did not have

14   access to the Internet.  So in order to -- when he used the

15   Internet he would go to a library.  So he was not at the library

16   again to try and intentionally evade detection.  So we strongly

17   disagree with the government's representation that Mr. Lamb was

18   somehow skilled in trying to avoid detection here.

19        I should also point out that Mr. Lamb intended to try and

20   pay his special assessment prior to sentencing.  His parents got

21   money out of his account because he wanted to pay it himself, he

22   didn't want his parents to pay it, and they tried yesterday to

23   pay the special assessment, and they had trouble finding the

24   courthouse and when they found the courthouse the clerk's office

25   was closed, but they're here today and they plan to pay the

1    special assessment today.

2          But I think that also goes heavily towards his acceptance

3    of responsibility.  Mr. Lamb is trying to do everything he can

4    to do what's right, to do what's proper, and to get back on the

5    right track.  He pled guilty -- I'm sure the Court remembers he

6    pled guilty quite some time after he was arrested, but that's

7    because there was a lot of --

8                THE COURT:  I understand the delay in all of that.

9                MR. MILES:  And we made it clear to the Court very

10   early --

11               THE COURT:  It really involved Count 2 and the issues

12   with respect to conduct in California.

13               MR. MILES:  Correct.  So his willingness to accept

14   responsibility was very early in this case.  When looking at the

15   history and characteristics of Mr. Lamb, Your Honor, we talk in

16   the presentence report about his unstable and troubled

17   childhood, about his father's absence, which his father admits,

18   as I saw in the revised report.  Mr. Lamb has some mental health

19   issues.  There was the serious abuse that I won't go into

20   detail.  The Court has read about it, I understand, and knows

21   about the abuse that he suffered as a child.

22          And as the Court pointed out, Mr. Lamb's criminal history

23   category is in the lowest criminal history category.  Mr. Lamb

24   did graduate from high school.  He attended some college.  He

25   did not complete college, but he does want to return to college

1    and he wants to earn a degree in the future.  That is a very

2    important goal of his.  He does want to be a productive and

3    successful member of society.

4         When looking at just punishment for the offense, based on

5    the nature of the offense, his troubled background, his

6    vulnerability at the time of the offense, his efforts towards

7    rehabilitation before the offense, even during the offense, and

8    we submit after the offense, because he wants treatment, he

9    wants to continue with his treatment, his early acceptance of

10   responsibility, we believe a 60-month sentence is a fair and

11   just sentence.

12        This is a sentence which results in a substantial period of

13   incarceration.  It's five years incarceration.  We're not simply

14   asking for probation, Your Honor.  Five years is a substantial

15   sentence.  I expect the Court will place some serious

16   restrictions on him with regard to supervised release.  I

17   imagine it will be a lengthy supervised release.  He will be

18   required to register as a sex offender.  He has a felony

19   conviction on his record now.  And he has suffered great shame

20   and embarrassment.  And due to all those factors, Your Honor, we

21   believe that a 60-month sentence is just, and a 60-month

22   sentence will provide adequate specific deterrence with regard

23   to Mr. Lamb as well as general deterrence in large part for a

24   lot of the factors I just mentioned.

25        It is a lengthy sentence.  There's the sex offender

1    registration, the supervised release, the felony conviction, all

2    these would seriously deter persons like Mr. Lamb and others.

3        With regard to community protection, Your Honor, we believe

4    there's no need to incarcerate Mr. Lamb for further than five

5    years.  I think there's a lot of significance to his age.  He

6    was quite young when he committed the instant offense.  I

7    believe he was about 21 years old at the time of the offense.

8    And if he receives a 60-month sentence, with good-time credits I

9    suspect he'll be 25, maybe 26 when he's released.  And although

10   that's just a few years, I think at that age -- at that stage in

11   a person's life, they stand to significantly mature during that

12   time.  And Mr. Lamb's treatment provider pointed out that

13   youthful offenders are much more easy to rehabilitate, and in

14   large part it has to do with immaturity.  Mr. Lamb will be much

15   more mature, and I can assure you that what he's gone through so

16   far has been a wake-up call for him and has not only contributed

17   to letting him realize the consequences for such conduct, but

18   it's also contributed to his maturity.

19       And so there's no need to incarcerate him for greater than

20   60 months in order to protect the community.  And of course when

21   he's out he plans to, as he has done in the past, he wants to be

22   treated and he wants to make sure that he doesn't engage in this

23   crime again.

24       And the treatment issue goes to the other factor about

25   correctional training, treatment or care.  We believe he would

best be treated by Dr. Nixon and Pat McAndrews, the people who have treated him previously.  They have a long working relationship.  Mr. Lamb trusts them.  And they believe -- and they're of course aware of what happened here, and despite what happened here, they still believe that what they were doing with Mr. Lamb was working.

And Ms. McAndrews notes that Mr. Lamb, either the day or day before his arrest, he wanted to talk to her about something, and she was convinced it was about this matter.  It was about what he was doing.  She knew this was eating him up and he wanted to talk about it.  I have confirmed with Mr. Lamb that that was in fact what he wanted to speak with her about.  And I think that is very significant.

We do argue, Your Honor, that having a sentence greater than 60 months is necessary to avoid an unwarranted sentencing disparity.  We do cite cases from other districts, as the Court pointed out, but I've argued that it appears clear to me that the trend in this district is moving away from guideline sentences in cases like this, and moving more closer to mandatory minimums and even probation in many cases.

Also, when comparing -- I don't think I mentioned this in the paper.  When we're looking at the Stabenow study, one thing they point out is that previously sentences in these types of cases were much lower because the base offense level was 13. Now, for what we believe to be unjustified reasons, the base

1  offense level has been increased by nine levels up to 22, and

2  they've resulted in these very high sentences.

3      And so there's -- looking over the last 10 years, a

4  sentence of greater than 60 months I think would create a great

5  disparity, when we look at the big historical picture of

6  sentencing in these types of cases.

7      And so it's for these reasons, Your Honor, that we do

8  request the Court impose a sentence of 60 months.  We ask for a

9  period of supervised release of not greater than 10 years, and

10  we also request that the Court allow Mr. Lamb to serve his

11  sentence at a federal correctional institute somewhere as close

12  as possible to the San Francisco Bay area in California.

13          THE COURT:  All right.  Thank you, Mr. Miles.

14      Does the probation office wish to add anything,

15  Mr. Penders?

16          MR. PENDERS:  Just briefly, Your Honor.  Thank you.

17  Specifically, with respect to filing my report yesterday, I

18  apologize to the Court and to the parties that it was a day

19  before sentencing.  However, I came into information that I

20  believed was not only important for sentencing but also

21  important for treatment later on for the defendant, either

22  within the Bureau of Prisons or while on a period of supervised

23  release.

24      And I understand that the mother of the alleged victim in

25  the Washington State case is present in the courtroom.  As

defense counsel pointed out, the defendant's family, who is here
to support him, I would like to point out that the mother of
that victim I believe is in the courtroom, as referenced in my
report in paragraphs 90, 94, 94A, 94B and flew just as far, from
Washington, for -- had an interest in what happens to Mr. Lamb
in that, regardless of what he pled to in the state of
Washington, I believe the Court must consider the allegations in
that case and the damage that was done to the family in the
state of Washington.  And I'm protecting her identity for the
Court.

Also, to the point of his treatment in California, the
probation office attempted to obtain records from that treatment
provider.  However, never received any return phone call or any
return to request of correspondence through the mail.  And I
think that that information would also be very important to the
Court.  I understand that the Court is in possession now of a
letter from a Ms. McAndrews, who we attempted to contact but did
not receive any information from.

And along those lines, any sex offender treatment provider
would tell you that treatment for a sex offender or someone such
as Mr. Lamb who presents these issues is not about a cure; it
rather is about maintenance for someone such as Mr. Lamb who has
these interests in child pornography or children.  And it's more
about maintenance.  And I would say that with respect to his
treatment being successful, I would have to vehemently disagree

1     with it being successful, because he's before Your Honor today

2     for sentencing, and that there was no maintenance.

3         Mr. Miles pointed to shame and embarrassment suffered by

4     the defendant.  And I think that the victim's mother can speak

5     towards shame and embarrassment more so than Mr. Lamb probably

6     could.  And I think the difference in a lot of the cases that

7     defense counsel pointed out to in disparity of sentences, the

8     majority of those defendants, I would say 95 percent of those

9     defendants did not have a prior offense, prior conviction

10    involving any sort of child pornography or contact with minors

11    in the respect that Mr. Lamb did.

12        I would suggest that the Court order the defendant to

13    enroll in the sex offender treatment program within the Bureau

14    of Prisons, which currently is only offered at the Devens,

15    Massachusetts facility.  I understand that Mr. Lamb would be

16    quite far away from his family, which is in California, by being

17    in Devens, Massachusetts, however, that program would only be

18    during the last 30 months of any sentence imposed by the Court,

19    therefore for the majority of -- first part of his sentence he

20    could be near family, and then afterwards receive that

21    treatment.

22        And also upon his release that he be ordered to enter into

23    a sex offender treatment program under the auspices of the

24    United States Probation Office, and not to return to the program

25    that he was in prior to being arrested in this case.  As I said

earlier, I don't believe it was successful.  That's all.

          THE COURT:  All right.  Thank you, Mr. Penders.

     Mr. Miles?

          MR. MILES:  Mr. Penders said a lot about which I
disagree, but I'm not going to respond to every comment he made.
There's one point I think that's important to raise.
Your Honor, I've been in touch with Ms. McAndrews and Dr. Nixon
for quite some time, even before Mr. Lamb pled guilty in this
case, and they are busy and sometimes it takes a little bit of
time for them to get back to me.  But I understand -- but being
in touch with them for quite some time and dealing with this
earlier, I was able to get the letter from them.

     And there was a time when Mr. Penders called me and talked
about potentially wanting to continue the sentencing so that he
can get information back from Ms. McAndrews and Mr. Lamb's
biological father.  And shortly after -- a day or two after that
phone call, I spoke with Ms. McAndrews and asked, oh, I
understand that the probation officer has contacted you about
materials, and let her know that's an issue about getting them
to him.  And Ms. McAndrews at that time had not heard from him.
And so I don't think that it's fair to make it seem like she was
nonresponsive or irresponsible for not having these materials to
Mr. Penders.

          THE COURT:  All right.  Thank you, Mr. Miles.

     Ms. Stewart, did you have anything you wanted to add,

1    particularly on the issue of unwarranted sentencing disparities?

2    Because the government hadn't really addressed that or had a

3    chance to address it this morning.

4            MS. STEWART:  Your Honor, there is no doubt that there

5    have been sentences below the guidelines in this district.

6    There's also been at least one sentence in one of the cases I

7    handled above the guidelines, by Judge Urbina.  The facts are

8    different.  The case that Mr. Miles I think is alluding to with

9    Judge Roberts was one where Judge Roberts did impose a below the

10   guideline, in fact below a recommended sentence by the parties

11   in a (C) plea.

12           That case had some similarities but some noticeable

13   differences, with a defendant who had a -- had at least a

14   litigatable defense of diminished capacity, and there were other

15   factors in that case.  I've handled several of the cases and

16   supervise a section that handles them.  I think it's fair to say

17   there have been guidelines sentences, some above, some not

18   significantly below, some significantly below.  I don't know

19   that there's a pattern.  I don't think we can really distinguish

20   one right now.

21           I know the Court's going to give me one more opportunity,

22   and I can wait to address something the probation officer said

23   or I can address it now, depending --

24           THE COURT:  One more opportunity when?

25           MS. STEWART:  You said at the end, if there was

1    anything the government felt it needed to --

2           THE COURT:  I'm only going to hear from one more

3    person, and that's Mr. Lamb.

4           MS. STEWART:  Very well.  With the Court's indulgence,

5    I will simply make my -- when the Court asked the government in

6    the beginning about its position with respect to the allegations

7    of prior sexual abuse in Washington, the government's position

8    was and still is with respect to the allegations in the court

9    case, there's no way to know whether in fact that ever happened,

10   and the government's position was even if it didn't, there's

11   enough indicia of his sexual interest in children.

12          Until Mr. Penders pointed out approximately five minutes

13   ago that the mother of the other alleged victim actually is in

14   this courtroom, the government did not propose that the Court

15   take that into consideration, because it was information that

16   was unverified.  It is now verifiable, at least to the extent

17   necessary in this proceeding.  As I say, I was not aware that

18   this victim's mother came to this court.

19          Whether or not she wants to be heard, she is available and

20   the Court can confirm to its satisfaction those allegations,

21   which are extremely serious, and in the government's view should

22   have an impact on the sentence that the Court imposes.  So to

23   that extent, the government's position is that with respect to

24   that victim, we urge the Court to take into consideration the

25   allegations, and to the extent the Court believes it's

1    appropriate, to verify them here in court.

2         Other than that, I would just note with respect to sex

3    offender treatment within the Bureau of Prisons, Mr. Penders is

4    correct.  The Devens program in Devens, Massachusetts, is only

5    available during the end.  However, the Bureau of Prisons is now

6    mandated by the Adam Walsh Act to establish sex offender

7    programs in various other facilities.  Some of them are maximum

8    security, such as Marion, some of them are not.  They're

9    correctional institutions.  But there is one in every

10   geographical area in the country, every BOP geographical area.

11        I don't know whether there's one in the San Francisco area,

12   but it is something to take into account, that that is available

13   even before the residential treatment program in Devens.

14        THE COURT:  All right.  Ms. Stewart and Mr. Penders,

15   maybe I could ask you jointly to walk back and consult with the

16   individuals who are here with respect to Ms. Stewart's proposal.

17   If you would.

18        MS. STEWART:  May we be excused to do that?

19        THE COURT:  Yes, please.

20     (Ms. Stewart and Mr. Penders consult with spectator.)

21        MS. STEWART:  Your Honor, she's willing to address the

22   Court.

23        THE COURT:  All right.  Mr. Miles?

24        MR. MILES:  A couple things.  Obviously, if somebody

25   wants to address the Court, that's fair.  I understand that she

1    is not even alleged to have been a witness to what happened, and

2    I don't know how what she says could shed light on whether or

3    not this incident happened.  But if she wants to speak,

4    obviously she's entitled to.  And I would like to also give the

5    opportunity to Mr. Lamb's mother and/or stepfather to speak as

6    well, if they'd like to.

7              THE COURT:  All right.  And does Mr. Lamb wish to

8    address the Court?

9              MR. MILES:  He does.

10             THE COURT:  All right.  Let's hear from everyone who

11   wishes to address the Court, and let's start with (indicates.)

12       If you're comfortable stating your name, it would help if

13   you could state your name for the record.

14             MS. BRIGATI:  I will.  Thank you, Your Honor.  My name

15   is Kate Brigati, and --

16             THE COURT:  Good morning.

17             MS. BRIGATI:  Thank you.  Thank you for --

18   B-R-I-G-A-T-I.  And Erik Lamb is my nephew, stepnephew, and I

19   have known him his entire life.  And I'm here today because --

20   on behalf of my children and the case that was held in Kitsap

21   County, and in my opinion I don't believe the case was given the

22   attention that was needed.  And I think most specifically

23   because my son, the victim, one of the assumed victims, suffers

24   from high functioning autism, and that was one of the things

25   that the defense attorney really focused on.

1    And it is my knowledge, not just as a mother, but as anyone

2    that can understand my son, that he can tell what is right and

3    what is wrong.  There were moments where he was flustered, yes,

4    but what happened and the information that came out after with

5    his -- he's been in abuse -- sexual abuse therapy for three

6    years, and the information that's come out since then, again, I

7    really wish that all had been there.  There were many instances

8    that he could verify and he could state.

9        There are also evidence -- there is also evidence that

10   abuse occurred with other children, including my infant

11   daughter.  That was something we decided we didn't want to move

12   forward with for obvious reasons.  As someone who actually has

13   loved Erik for many years, I understand he has a very big

14   problem.  I would like him to have all the treatment possible.

15   Obviously, the original treatment did not work.  And I think it

16   needs to be certainly taken to a much bigger level.

17       I'd also like to point out that the court in Washington

18   asked him to register as a sex offender in Washington State,

19   which he did not do.  And that was very disconcerting for our

20   family.  It was more of a formality, but we still needed that to

21   be done.  So I really thank you for letting me speak on behalf

22   of my children and on behalf of all of the children that have

23   been victimized by this case.

24           THE COURT:  Thank you.  Thank you for coming.

25           MS. BRIGATI:  Thank you.

1          THE COURT:  Now if Mr. Lamb's parents, either or both

2     of them wish to speak.

3          (Defendant's mother approaches.)

4          MS. LINN:  Good morning.

5          THE COURT:  Good morning.

6          MS. LINN:  My name is Carolyn Linn, C-A-R-O-L-Y-N

7     L-I-N-N.  I'm Erik Lamb's mom.

8          THE COURT:  Welcome and good morning.

9          MS. LINN:  Thank you, and good morning to you.  As for

10    the case that happened in Washington, Erik, we had hired an

11    attorney in the State of California who originally represented

12    Erik, who hired a polygrapher, a former CIA polygrapher, and at

13    that time Erik took a polygraph, and they specifically asked him

14    if these events had occurred, and he said no, and the polygraph

15    verified that he was telling the truth.

16         He subsequently was asked to -- he was ordered by the Court

17    to see their court-ordered psychologist in the state of

18    Washington, and he also had a polygrapher that he had do a test

19    on Erik, and again the test said that Erik did not commit the

20    offense.  And in the statement that the counselor sent to the

21    Court, he said he also believed that Erik had not committed the

22    offense.

23         In the counseling that Erik had been receiving prior to

24    this, that counselor also hired a polygrapher to test Erik, and

25    once again, they found that he had not committed that offense.

1    We don't think that there's not a problem.  We're not

2    saying that he didn't commit the offense he's accused of now,

3    nor do we believe that he has no problems, he doesn't need

4    treatment; we certainly want treatment for him ourselves, but we

5    don't believe that he committed the crime that he was accused of

6    there.

7        We discussed it with him and with his attorney.  He took

8    the Alford plea because he felt that that was the best way to go

9    about this.  He was 18, the children were young.  He did not,

10   per our attorney, have to register as a sex offender anywhere,

11   which is why he didn't register in Washington or in the state of

12   California.  The attorney had met with the judge and we were

13   told that he did not have to, based upon California law and the

14   crime that he pled to.

15       He did at that time insist on having an Alford plea because

16   he didn't want to confess to a crime he hadn't actually

17   committed.  When he came home, he did go through treatment.  He

18   has been in treatment regularly.  He has gone voluntarily.

19   There have been some improvements, but certainly there still

20   have been a lot of problems.

21       So it's our hope that he can come back -- after he's served

22   the sentence that you decide upon -- to the family that loves

23   him and that we can help him, that he can continue to go to

24   counseling and be surrounded by positive influences.  And now

25   that we're all more aware of the depth of his problem, that we

1    can do whatever it is we can to try and help him get better and

2    to make sure that everybody around him as well as him and his

3    family remain safe.  Thank you.

4          THE COURT:  All right.  Thank you, Ms. Linn.

5       Mr. Lamb, if you would like to address the Court.

6          THE DEFENDANT:  May I talk to my attorney?

7          THE COURT:  Certainly.

8       (Defendant conferring with counsel.)

9       (The defendant approaches.)

10         THE DEFENDANT:  Good morning, Your Honor.

11         THE COURT:  Good morning.

12         THE DEFENDANT:  Do you want me to state my name again?

13         THE COURT:  No.  We know who you are.

14         THE DEFENDANT:  Okay, good.  For the last few years, I

15   have indeed had this problem.  I'm the first one to admit it,

16   last one to have to deal with this, but I'll be having to deal

17   with it probably for the rest of my life.  I mean, I'll be open

18   and honest in admitting that.

19       In 2006 I did in fact start treatment with Pat McAndrews

20   and Dr. Nixon, who were very rigorous as far as I could tell,

21   making every person come to at least two meetings or more a

22   week.  It came to a point where I slipped, where I made the

23   mistake.  It was nothing on them or how hard they were going.  I

24   tripped on my path to getting better and started focusing back

25   on old habits.

1        I came to a point, as my attorney spoke before, that a few

2   days or so before I had got arrested, I had gone to Pat

3   McAndrews and I requested specifically that I have an

4   appointment very soon so that I could discuss something.  What I

5   was going to discuss, which my lawyer couldn't tell you but I

6   can, is this exact thing; that I knew I'd slipped, that clearly

7   I couldn't take care of it by myself, and so I needed someone to

8   help me.  And Pat McAndrews and Dr. Nixon were the ones who

9   seemed best to help me with that, because they were the ones

10  that were already helping me.

11       Through this course of 2-1/2 or so years that I have been

12  with them, I have found that the deviance that I started with

13  has diminished greatly.  Still there, clearly, since I'm

14  standing here in front of you today, but it has helped.  Along

15  with that, they also showed me that, as you stated, this is not

16  a victimless crime, that it does in fact hurt people.  They also

17  showed me how the victims themselves are hurt, how it hurts

18  them, how it hurts me, how it hurts the community, that everyone

19  at large.

20       Once I was incarcerated, once I came to D.C., through both

21  my attorney and through the law library in the jail, because I

22  have read numerous case studies on this, I have -- it's

23  enhanced, it's deepened my understanding for -- sorry.

24            THE COURT:  That's all right.  Take your time.

25            THE DEFENDANT:  For the pain that this causes, both

1    short term and long term for the victims.  It showed me how,

2    truly and completely, how this isn't a victimless crime, because

3    I'll admit at first I had doubts.  None now.  I completely

4    comprehend, as far as I can understand, what -- at least the

5    basic understanding of this.

6         The moment Mr. Miles informed me of the victim impact

7    statement, my first comment was to him, I would like to see

8    that, I would like to read that, because I insist on knowing

9    everything I possibly can about this now so that I can do my

10   best until I can get help for it.

11        As for this year, this is the longest I've ever been

12   incarcerated.  It's been terrible.  I mean, to say the very

13   least.  But nothing compared to what has happened to these

14   children that I viewed.  As Mr. Miles has stated, and the

15   prosecutor as well, I didn't actually do this.  I didn't

16   actually create this thing.  But I do fully understand that by

17   viewing, by collecting, by pulling these images, I am helping in

18   certain ways to produce this.

19        On all this, through all these months, all these 12 months

20   that I've been, plus before while I was in counseling, I slowly,

21   and I'll admit slowly, I slowly grew to sympathize, to

22   understand, and it saddened me.  It hurt, you know, inside about

23   what I was doing.  Yes, I need help.  I'll admit that.  I need

24   help.  Thank you.

25             THE COURT:  All right.  Thank you, Mr. Lamb.

1          Give me one moment, please.  All right.  As I indicated

2     earlier, I have reviewed all the materials that have been

3     provided to me and have now heard from several individuals, as

4     well as from counsel, and I appreciate greatly those who have

5     come a long distance and who have provided information for me to

6     consider.  I've read all the letters that have been provided as

7     well, and I'm now going to review the reasons for and the

8     sentence to be imposed.

9          I will go through this only once, although at the end I

10    will give counsel an opportunity to make any legal objections

11    before the sentence is actually imposed.  And at this point, I

12    would ask Mr. Lamb and Mr. Miles to come up to the lectern,

13    please.

14         (Counsel and defendant comply.)

15         Let me deal with an easy part of this to begin with, and

16    that is that I've determined that no fine is appropriate in this

17    case, both because there's an inability to pay a fine based on a

18    review of the financial information available, and because of

19    the nature of this offense and the circumstances, a fine is not

20    really warranted.

21         Now for the more difficult portions.  Sentencing is always

22    a difficult task.  It is, if not the, it is certainly one of the

23    most difficult things that a judge, including federal judges,

24    has to deal with.  And indeed, child pornography offenses pose

25    some of the most difficult sentencing contexts for federal

1    judges.

2         We have here a guilty plea to two significant offenses

3    under Title 18 Section 2252A, both transportation and possession

4    of child pornography.  The sentencing guidelines, as we've

5    reviewed here today and as counsel agree, result in a range of

6    151 to 188 months.  That's approximately 15 years' incarceration

7    at the bottom of that recommended guideline range, which the

8    Court takes into account and is an advisory sentence in this

9    case.

10        That range is built on a structure of special offense

11   characteristics that are set out in Section 2G2.2 of the

12   sentencing guidelines, and normally speaking, those guidelines

13   should receive some consideration and deference from the Court.

14        The government has asked for a sentence, in the Court's

15   discretion, but I think in the totality of the materials that

16   they have submitted, has asked for a sentence at the bottom of

17   that guideline range, focusing on some of the more serious

18   considerations of this offense and responding to some of the

19   arguments that the defense has made.

20        The defense, on the other hand, asks for a sentence of the

21   statutory mandatory minimum, which is 60 months, focusing on the

22   inadequacies or inequities of the sentencing guidelines

23   structure.

24        Now, the sentencing guidelines are important, but so too

25   are the factors set out at Title 18 of the United States Code,

Section 3553(a).  Those include the nature and circumstances of the offense here.  The offense is an extremely serious one, which the defendant himself and certainly all others in this courtroom, including those who have addressed the Court today, and who have addressed the Court through under seal submissions under 18 U.S.C. 3509, would agree is not a victimless crime.

Child pornography has a devastating impact.  In this, as Ms. Stewart has pointed out, market-driven world, it has a devastating impact on the child victims and their families, both at the time that they are specifically victimized, and then continuously over the course of time thereafter, both through the fact that there is a continuing review and access to the images that are produced, and because of the psychological and other impacts that children and their families have to deal with from day to day, month to month, and year to year.

The history and characteristics of the defendant include someone who had some difficulties in his upbringing, some specific events that may have contributed to where he is today, both in terms of his mental health and this offense.  He has one past offense that is relevant to my consideration.  The facts are somewhat in dispute with respect to that offense and to surrounding conduct, and I have heard, both through submissions incorporated into the presentence investigation report and through those who have spoken today, about those circumstances.

With respect to the need for a sentence which reflects the

seriousness of the offense, there's no doubt in my mind that a substantial period of incarceration is warranted.  To promote respect for the law, that too requires a substantial period of incarceration, and to provide just punishment for the offense.

All of those considerations warrant a substantial period of incarceration.  Similarly, that kind of sentence is warranted to afford adequate deterrence, both to the defendant and to others, and to protect the public from further crimes.

I think as well in this context it's my assessment that treatment available through the Bureau of Prisons will be beneficial to the defendant, and therefore a substantial period of incarceration is warranted, to provide the defendant with needed care and treatment.

Now, I also must consider under 3553(a)(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, and I'll come to that again in a moment.

These factors under 3553(a) in my judgment support a considerable sentence of incarceration, a sentence above 60 months, which is the mandatory minimum.  The question, then, is whether they support a sentence of approximately 15 years or more, which is the bottom of the guideline range.

We have a structure under the sentencing guidelines that results in that range in this case, which I think it is safe to say, at least from my perspective, is not perfect.  The two

1    examples that have been focused on most directly here today are

2    the two-level offense level increase for use of a computer, and

3    the in this case five-level increase based on the number of

4    images.

5         With respect to the computer, there may be a quibble, and I

6    don't mean that derogatorily, but there may be a quibble as to

7    whether all cases these days involve computers, but there

8    certainly is no doubt that almost all cases involve the use of

9    computers.  And structurally, it is odd that an enhancement

10   would occur for something that is almost always present.  And I

11   think that is a flaw in the sentencing guidelines.

12        And it's a flaw that many courts have observed and indeed

13   studies have observed.  It's not a problem that is based on the

14   particular facts of this case, but is rather a structural

15   problem with respect to the guidelines, and it's born of the

16   conclusion that many judges have reached, that Section 2G2.2 of

17   the guidelines is not the product of empirical data and national

18   experience, but has instead been driven by, shall we say,

19   congressional directives.  And for that reason, many courts have

20   concluded that these portions of the sentencing guidelines

21   should not receive the kind of weight and deference that is

22   often given to the guidelines.

23        That is an argument that also exists with respect to the

24   number of images, and in this case, with over 600 images, a bump

25   up in offense level of five levels.  The ease of access to high

1    numbers of images on the Internet is of course a result of the

2    use of computers, and the way that the market works,

3    unfortunately, is that it isn't very difficult to wind up with

4    large numbers of images under the sentencing guidelines

5    calculation methodology.

6        That isn't to say, as I observed earlier, that how

7    widespread a particular defendant's review of child pornography

8    happens to be, it isn't to say that that isn't a factor.  That

9    is a factor, and that's a valid factor.  The difference between

10   a casual incidental review of images and a continuing,

11   widespread review of images is something to be taken into

12   account in sentencing in my view.

13       It's also true, as the defense has pointed out, that this

14   is not a case of a commercial interest or commercial involvement

15   in child pornography.  So, when I look at the sentencing

16   guidelines structurally, I am driven to the conclusion that all

17   of these special offense characteristics, which add up to, I

18   think my recollection is correct, without going back and adding

19   them up, a 13-level increase when you add all the special

20   offense characteristics up under the application of 2G2.2.  That

21   seems to me to be structurally deficient and gives rise to too

22   high an increase in offense level in this case.

23       What my ultimate conclusion is is that the guidelines range

24   is higher than warranted.  Now, Ms. Stewart did point out

25   something.  She said if you eliminate the two-level increase for

computer, you're down to a range that begins at a bottom of 121.
If you don't give five additional level increase for the number
of images, but only give it two or three level increase, you'd
be down more into a range of just under 100 months, at the
bottom of the guideline range, I believe.  Yes.

Now, I am also concerned about the issue of unwarranted
sentencing disparities.  The defense has made an argument in its
memorandum based on cases outside of this jurisdiction.  I
glanced at those cases.  I don't think that they necessarily fit
into the category of a defendant with a similar record found
guilty of similar conduct.  But nor do all the cases in this
district fit squarely into that.

But my assessment is, and in particular looking at cases in
this district, which would include United States v. William
Hedgpeth, which is criminal number 08-251, where 70 months'
incarceration was the sentence, and United States v. Jeremy
Slagle, criminal number 08-308, where 84 months of incarceration
was the sentence, and United States v. Michael Reed, criminal
number 08-287, where 90 months was the period of incarceration
in the sentence.

When I look at those, I do get the impression,
notwithstanding the government's more general assessment that
there isn't really a pattern, I agree that there might not be a
trend that Mr. Miles wishes to identify, but it does seem to me
that 151 months would be above what the judges in this district,

and indeed perhaps nationally as well, are imposing as an

appropriate sentence for a defendant in similar circumstances

for similar conduct.

Now, I'll make a couple of other observations.  One with

respect to remorse and/or the point that the defendant has been

skilled at hiding his behavior and perhaps has minimized his

conduct.  I heard Mr. Lamb, I listened closely to him, and I do

believe that he is demonstrating an awareness of the seriousness

of this activity and this crime, and an awareness of the impact

on innocent victims of this crime.  And I factor that into my

assessment, and that is a demonstration of remorse that is

meaningful.

I am concerned, notwithstanding the arguments of his

counsel, that there has been some demonstration of evasiveness,

both with respect to the conduct he engaged in and with respect

to how forthcoming he has been in the process subsequent to his

arrest.  I don't believe he's been forthcoming at all times.

He's tried to avoid any discussion of certain things, shown some

unwillingness to open up on some subjects, and I just can't

conclude that he's been 100 percent forthcoming, and I can

conclude that he has shown some desire and ability to conceal

his conduct in the past.

Nonetheless, I do think that he is remorseful and

recognizes the seriousness, not only of the consequences that he

now faces, but of the conduct that he has engaged in.

1    That brings me, however, to the last and perhaps the most

2    difficult consideration, and that is the past conduct in

3    Washington State, and whether, and if so, how I should take that

4    into account in sentencing here today.  I will note that while

5    others have spoken to that, Mr. Lamb has not.

6        It seems to me that I have before me some very serious

7    information.  It may not be enough to be the basis for a

8    specific adjustment under the guidelines, either under

9    2G2.2(b)(5), which has not been applied here, or even under

10   2G2.2, the comment at note 6.  But nonetheless, it is extremely,

11   extremely serious.

12       The government to begin with said that they can't say for

13   sure what happened, but then, given those who have come a long

14   way, felt that I should hear, and I welcome that opportunity and

15   should consider that conduct.  The government pointed out, I

16   think correctly, that it in general is supportive of the

17   conclusion that there's a long-term sexual interest in children

18   that the defendant has demonstrated, and indeed admitted at

19   times even in the past in terms of continuing fantasies.

20       But I'm going to set that aside for the moment and talk

21   about where I wind up with respect to the sentence in any event.

22   Considering all of the relevant information and factors,

23   including the need for treatment on a continuing long-term

24   basis, and the observation that treatment that has been received

25   has demonstrably failed in the past, I've concluded that a

1   sentence of 90 months incarceration is the appropriate sentence

2   in this case.

3       That is warranted under consideration of all the factors

4   under Section 3553(a) and taking into account the sentencing

5   guidelines as well.  It is consistent with the nature and

6   circumstances of the offense, and the history and

7   characteristics of the defendant, and will address the other

8   factors under 3553(a)(2) of the guidelines.

9       As well, I think it is consistent with 3553(a)(6), the need

10  to avoid unwarranted sentencing disparities.  I've assessed

11  those other cases, and where this case fits, it seems to me, is

12  at a sentence that is well under the guidelines but not down at

13  the mandatory minimum.  Indeed, this sentence is closer to the

14  mandatory minimum than it is to the guidelines.  It is much

15  closer, quite frankly.  But nonetheless, I think it is

16  consistent with all of the relevant considerations and with what

17  is being done in other similar cases.

18      It amounts to 7-1/2 years of incarceration, a substantial

19  period of incarceration, but one that I think is warranted under

20  all the circumstances here today.  And that is the sentence that

21  the Court will impose.  I am now going to read the sentence that

22  will be imposed in this case, although, as I said, I will give

23  counsel one last opportunity to object before I formally impose

24  it.

25      Now, this is a long sentence, because there are many

additional components to the sentence.  It is the judgment of

the Court that you, Erik Lamb, are hereby committed to the

custody of the Bureau of Prisons for concurrent terms of 90

months on each of Counts 1 and 2.  You are further sentenced to

serve 180 months of supervised release on each of Counts 1 and

2, and to pay a $200 special assessment as required by statute.

The Court finds that you do not have the ability to pay a

fine and therefore waives imposition of a fine in this case.

The special assessment is immediately payable to the clerk of

the court.  Within 30 days of any change of address, you shall

notify the clerk of the court of the change until such time as

the financial obligation is paid in full.  You shall make

payments on the special assessment through your participation in

the Bureau of Prisons' inmate financial responsibility program.

Within 72 hours of release from custody, you shall report

in person to the probation office in the district to which you

are released.  While on supervision, you shall not possess a

firearm or other dangerous weapon.  You shall not use or possess

an illegal controlled substance, and you shall not commit

another federal, state or local crime.  You shall also abide by

the general conditions of supervision adopted by the U.S.

Probation Office, as well as the special conditions I'm about to

recite.

First, however, let me say that you will receive credit for

time served already, and that I will recommend to the Bureau of

1    Prisons that you be placed, initially at least, in a

2    correctional institution in the state of California, near the

3    San Francisco area if possible.  But I will also recommend that

4    you receive treatment while in the Bureau of Prisons, and

5    particularly treatment through the sex offender treatment

6    program.

7         Now, with respect to special conditions from the probation

8    office, special conditions of supervision, first, pursuant to 42

9    U.S.C. Section 14135a for all felony offenses, you shall submit

10   to the collection and use of DNA identification information

11   while incarcerated in the Bureau of Prisons, or at the direction

12   of the U.S. Probation Office.

13        Second, you shall comply with the sex offender registration

14   requirements for convicted sex offenders in any state or

15   jurisdiction where you reside or are employed, carrying on a

16   vocation or are a student.

17        Third, you are precluded from accessing any computer

18   without the approval of the probation office.  If granted

19   approval of use of a computer, you shall not possess or use any

20   data encryption technique or program, and shall refrain from

21   accessing via computer any pornographic images.

22        You shall maintain a daily log of all Internet addresses

23   accessed by way of a computer other than those authorized for

24   employment, and shall make the log available to the probation

25   office for review.  And you shall not possess or use a computer

that has access to any online computer service at any location, including your place of employment, without the prior approval of the probation office.  Online computer services include but are not limited to any Internet service provider, bulletin board system, or any other public or private computer network.

If granted approval of use of a computer, you shall submit to periodic unannounced examinations of your computer and any computer accessed by you by the probation office.  You shall consent to third-party disclosure to any employer or to any future employer prior to accepting any employment offer concerning any computer-related restrictions that are imposed. You shall not be employed in any capacity or participate in any volunteer activity that involves contact with minors except under circumstances approved in advance by the probation office.

You shall cooperatively participate in a mental health program specifically related to sexual offender therapy, as approved by the probation office, and abide by all program rules, requirements, and conditions, which may include but are not limited to submission to periodic and random polygraph testing, plethysmograph examinations, and ABEL assessments.

You shall not associate or reside with any known sex offender.  You shall have no direct or indirect contact with children age 18 or younger, and shall refrain from loitering in any place where children congregate, including but not limited to residences, arcades, parks, playgrounds and schools, without

1    the approval of the probation office.  And you shall not reside

2    with a child or children under the age of 18 without the

3    expressed and written approval of the minor's legal guardian,

4    and the written or oral permission of the probation office.

5        Without the prior approval of the probation office, you

6    shall not possess any pornographic or sexually oriented

7    materials, including visual, auditory, telephonic or electronic

8    media, and/or computer programs or services that are relevant to

9    your offense conduct or behavioral pattern relating to child

10   pornography.  And you shall not patronize any place where

11   pornography or erotica can be accessed or are expressly offered,

12   obtained or viewed, including establishments where sexual

13   entertainment is available.  That would include adult book

14   stores, peep shows, adult entertainment establishments,

15   et cetera.

16       Without the prior approval of the probation office, you

17   shall not utilize 900 adult telephone numbers or any other

18   sexually related telephone numbers, and shall confirm compliance

19   through the submission of personal and business telephone

20   records.

21       You may not own or possess any type of camera or video

22   recording device without the approval of the probation office,

23   which does not refer to a DVD or VCR player.

24       Now, the probation office shall release the presentence

25   investigation report to all appropriate agencies in order to

1    execute the sentence of the Court.  Treatment agencies shall

2    return the presentence report to the probation office upon the

3    defendant's completion or termination from treatment.

4         Finally, Mr. Lamb, you were convicted following a plea of

5    guilty.  You can appeal your conviction if you believe that your

6    guilty plea was somehow unlawful or involuntary, or if there is

7    some other fundamental defect in the proceedings that was not

8    waived by your guilty plea.  You also have a statutory right to

9    appeal your sentence under certain circumstances, particularly

10   if you think the sentence is contrary to law.

11        You have the right to apply for leave to appeal in forma

12   pauperis, and if you so request and were to qualify, then the

13   clerk of the court would prepare and file a notice of appeal on

14   your behalf.  But I note that you have very able counsel who is

15   representing you here today, who would presumably assist you in

16   that process if you wish to follow it.  With few exceptions, any

17   notice of appeal must be filed within 10 days of the entry of

18   judgment.  I expect that judgment will be entered either today

19   or possibly not until Monday.

20        With that, Counsel, I will ask whether you know of any

21   reason, other than reasons that have already been stated and

22   argued, why this sentence should not be imposed as I have just

23   indicated.  Ms. Stewart?

24             MS. STEWART:  No, Your Honor.  If I might ask a

25   question with respect -- to clarify the Court's sentence.

1          THE COURT:  You may.

2          MS. STEWART:  With respect to the term of supervised

3   release, the Court indicated 180 months on each count.  Was that

4   to run consecutive or concurrent?

5          THE COURT:  Those would be concurrent.

6          MS. STEWART:  Thank you, Your Honor.

7          MR. MILES:  Your Honor, can I have a moment with

8   Mr. Lamb?

9          THE COURT:  You may.

10       (Counsel conferring with the defendant.)

11         MR. MILES:  Your Honor, the discussion we're having

12   has nothing to do with -- it's the supervised release portion of

13   the Court's sentence.  One concern I have is the Court ordered

14   that there be no direct or indirect contact with children or

15   where children may be.  We think that that's overly broad.  For

16   example, if Mr. Lamb were to work in a grocery store and a child

17   comes to his register, that would place him in contact with a

18   child.

19         THE COURT:  All of those conditions are subject to the

20   approval of the probation office, and if he had a job in a

21   grocery store, I am sure that unless there were some additional

22   concerns that arose, that the probation office would take that

23   into account and presumably give its approval for that

24   employment.

25         MR. MILES:  What we would like to do, out of an

1    abundance of caution, is make a general objection to the

2    conditions of supervised release that have been imposed, to

3    preserve his right in case we appeal any of the issues.

4              THE COURT:  All right.  Your objection is noted.

5              MR. MILES:  Thank you.

6              THE COURT:  And to all conditions, or are you

7    specifying certain conditions?

8              MR. MILES:  Frankly, it would be certain conditions,

9    but to be more careful I'd like to say to all conditions, to be

10   more careful for the record.

11             THE COURT:  It's an interesting use of the word

12   "careful" to say that you want to be vague and general and

13   that's more careful, but I'll allow you to do that.

14             MR. MILES:  Thank you, Your Honor.  I think my

15   appellate section would be happier with me --

16             THE COURT:  Don't let Mr. Lamb leave yet.

17             THE DEFENDANT:  Yes, Your Honor.

18             THE COURT:  All right.  I've heard from counsel.

19   Anything from probation?

20             MR. PENDERS:  No, Your Honor.

21             THE COURT:  Having heard from counsel and noting that

22   the defense has reserved objections to the conditions of

23   supervision, I order that the sentence is imposed as I have

24   indicated that sentence.  That is the sentence of the Court and

25   it is so ordered.

1          You will now be remanded to the custody of the marshal.

2    And Mr. Lamb, you have a long road ahead of you, and I wish you

3    success in dealing with all of these problems.  And I thank

4    everyone who has come today to these proceedings, some of you

5    from very long distance.  And with that, anything further,

6    Ms. Stewart?

7                MS. STEWART:  Yes, Your Honor.  Mr. Lamb pled to an

8    information.  The government would move to dismiss the original

9    indictment.

10               THE COURT:  And that indictment will be dismissed.

11       Anything further, Mr. Miles?

12               MR. MILES:  He was ordered to pay a special assessment

13   while at the Bureau of Prisons.  I indicated earlier his family

14   is here.

15               THE COURT:  If it's paid, then he won't have anything

16   at the Bureau of Prisons.

17               MR. MILES:  Okay.  We may do it that way, Your Honor.

18   Thank you.

19               MR. PENDERS:  His family can get a form from me,

20   Your Honor, to take to the clerk's office.  So there's no

21   confusion.

22               THE COURT:  I appreciate that, Mr. Penders.

23        All right.  With that, these proceedings are completed.

24   Thank you all very much.

25          (Proceedings adjourned at 11:07 a.m.)

\* \* \* \* \* \*

CERTIFICATE

       I, BRYAN A. WAYNE, Official Court Reporter, certify that the foregoing pages are a correct transcript from the record of proceedings in the above-entitled matter.

       _____
       BRYAN A. WAYNE